UNITED STATES DISTRICT COURT
                              FOR THE
                        DISTRICT OF VERMONT


UNITED STATES OF AMERICA        :
                                :
v.                              :        No. 2:12-cr-153
                                :
BENJAMIN MAYBERRY and           :
DANIEL DEGRACE,                 :
                                :
        Defendants.             :

                         **Opinion and Order**

     Daniel DeGrace and Benjamin Mayberry are charged with

knowingly possessing stolen firearms that were shipped and

transported in interstate commerce in violation of 18 U.S.C. §§

922(j), 924(a)(2).  Both DeGrace and Mayberry move to suppress

physical evidence and statements they claim were obtained in

violation of the Fourth Amendment.  *See* ECF Nos. 23-24.

                            **BACKGROUND**

**I.    Investigation of the December 2, 2012 Shooting**

     On December 2, 2012, at approximately 11:30 PM, officers of

the Nashua, New Hampshire Police Department ("NPD") responded to

a 911 call reporting that a man had been shot outside the

apartment building at 1 Salvail Court in Nashua.  When the

officers arrived, they found an unconscious man, later

identified as Billy Joe Parker, lying on the ground directly in

front of the building and bleeding from a gunshot wound to right

rear side of his head.  The responding officers considered the

wound to be consistent with either a close-contact wound or a self-inflicted wound.

Within minutes of arriving on the scene, NPD officers made contact with the tenants of the apartments inside 1 Salvail Court.  Officers obtained verbal consent from the tenants of each apartment to conduct brief searches for possible suspects. When conducting a search of Apartment 1, NPD officers did not locate any suspects; however, they found a bedroom next to the kitchen door that was locked with a padlock.  Paul Bernazzani, one of the residents of that unit, informed officers that his roommate, Daniel DeGrace, lived in the padlocked bedroom.

From late December 2 into the early morning hours of December 3, NPD officers interviewed a number of individuals as part of their investigation into the shooting of Parker.  They first spoke with Keith Gustafson, who had recently moved out of 1 Salvail Court and into a building nearby.  Gustafson was very emotional during the interview.  He stated that he was Parker's good friend for four or five years.  Gustafson explained that earlier that evening, he met up with Parker and that the two of them had been drinking beer and smoking marijuana outside of 1 Salvail Court.  Gustafson said that he and Parker had gone to Apartment 2, where Kelly Duquette and Tanisha Diaz lived, and had continued to party there.  Later in the evening, Gustafson realized that they were almost out of beer and running out of

2

time to buy more, as it is illegal for stores to sell alcohol after midnight in New Hampshire.  Gustafson told officers that he had asked Parker if he could use Parker's bicycle to get more beer.  Parker replied that he could use the bike but that he needed to unlock it and retrieve his gun first.  Gustafson and Parker went outside together, Parker unlocked the bike and removed an object from a pouch attached to it, and Gustafson set off for the store alone.

Gustafson stated that it took him several minutes to travel to the store and back.  When he returned, he found Jason McCarthy, a tenant of Apartment 3, screaming uncontrollably out of his window and saw Parker lying on the ground outside the apartment building.  Gustafson parked the bike, walked over to Parker, and observed a pool of blood around his head.  Gustafson then called 911 while Tanisha Diaz, another tenant, attempted to provide aid to Parker.  When asked if he knew about anyone by the name of "Dan" who resided in the building, Gustafson became confrontational and refused to answer additional questions.

NPD officers also interviewed Tanisha Diaz, a resident of Apartment 2.  Diaz confirmed that she had been in her apartment along with Kelly Duquette (her roommate), Gustafson, and Parker. Diaz stated that Gustafson and Parker left her apartment around 11:25 PM and that shortly afterwards, she heard a loud bang. Diaz opened her door to see what caused the noise and saw Parker

3

lying on the ground.  Diaz stated that the only other person she saw was DeGrace, who was standing by his car, a white four-door Toyota sedan, approximately 35 feet from where Parker was lying. Diaz explained that she found it odd that DeGrace was not doing anything to help Parker, whom she knew to be DeGrace's friend. Soon afterwards, Diaz observed DeGrace enter Apartment 1 and exit shortly thereafter with his friend (later identified as Benjamin Mayberry).  Diaz stated that both men carried bags to DeGrace's white Toyota and that Mayberry was also carrying a blanket.  The two men entered the vehicle, DeGrace in the driver's seat and Mayberry in the passenger's seat, and left. Diaz said that she then witnessed Gustafson return, discover Parker, and call 911.  At the end of the interview, Diaz identified both DeGrace and Mayberry in separate eight-person photo lineups.  *See* Exs. 5-6.

NPD officers then spoke with Diaz's roommate, Kelly Duquette.  Duquette corroborated Diaz and Gustafson's accounts of the evening.  Duquette also stated that after hearing what sounded like a firecracker or gun shot, she saw Gustafson return and begin helping Parker.  She also observed DeGrace fumbling with some items in the trunk of his white Toyota sedan before departing in that vehicle.

Detectives also interviewed Jason McCarthy, a tenant of Apartment 3.  NPD officers first attempted to interview McCarthy

soon after they arrived on the scene, but at the time, he was too emotional to answer questions. McCarthy stated that he fell asleep earlier in the evening of December 2 but awoke to the sound of people arguing in the area outside his apartment. He arose to go to the bathroom and then heard a loud noise that sounded like a firecracker or an explosion. From his kitchen window, he was Parker's body on the ground and began screaming for someone to call 911. Initially, McCarthy stated that the only other person he saw outside was Gustafson, who was on his cell phone and appeared to be calling an ambulance. When asked specifically about DeGrace, McCarthy became agitated and hesitant to talk, but he eventually stated that he had seen DeGrace in the area the same time that he viewed Parker on the ground. McCarthy also revealed that he saw DeGrace get into a white, four-door vehicle and leave the area. McCarthy knew Mayberry but denied seeing him after Parker's shooting. McCarthy identified DeGrace in a photo lineup. *See* Ex. 7.

NPD officers interviewed Carolyn Starkey, who lived with DeGrace and Bernazzani in Apartment 1. Starkey confirmed that the padlocked bedroom by the kitchen belonged to DeGrace. Starkey stated that DeGrace arrived home a day or two prior after driving to Vermont, where he had picked up Mayberry. Starkey revealed that after police arrived on the scene, she received a call from DeGrace on his cell phone. She stated that

DeGrace had told her that Parker had shot himself, that he (DeGrace) had taken the gun and fled the scene, and that he (DeGrace) had thrown the gun in a river.  Starkey further stated that after the call, she texted DeGrace to tell him not to come back because police were in the apartment.  Starkey also said that she had tried to call DeGrace back, but when he did not answer, she left a message.  Detectives reviewed the contents of Starkey's cell phone and located an incoming call from "Dan" around 12:32 AM, as well as a subsequent outgoing phone call to the same number.  Records obtained for DeGrace's phone number were consistent with Starkey's account and showed that DeGrace's cell phone signal hit towers near Manchester, New Hampshire in the early morning hours of December 3, 2012.  Ex. 9.  Manchester is north of Nashua, and both towns are on the Merrimack River, which runs north to south.

Finally, NPD officers interviewed Jessica Winfield, a tenant of Apartment 3.  Winfield observed Parker lying on the ground after the shooting and remembered seeing Diaz, Gustafson, and DeGrace outside the apartment building.  She also stated that she saw DeGrace get into a small white vehicle and drive away.  In an interview earlier in the evening, Winfield had not mentioned DeGrace.  Winfield explained that she had not initially mentioned DeGrace because she was worried about him and did not want to "snitch."

On the morning of December 3, 2012, NPD confirmed that DeGrace was the registered owner of two vehicles, one of which was a Nissan Maxima that was parked at Salvail Court when the officers arrived.  The other car, a 1995 beige Toyota Avalon with a New Hampshire registration of 329-3905, was unaccounted for.  NPD officers ran criminal records checks on both DeGrace and Mayberry.  The checks revealed that Mayberry had two felony convictions for burglary, two felony convictions for theft by unauthorized taking, and a New Hampshire restraining order prohibiting him from possessing firearms and other weapons.  Ex. 11.

At approximately 7:00 AM on December 3, the Honorable Thomas E. Bamberger of the New Hampshire District Court issued search warrants for DeGrace's apartment at 1 Salvail Court and for the area outside the building where police found Parker's body the day before.  The search warrants indicated that there was probable cause to search these locations for "evidence of the crimes of first degree assault and falsifying physical evidence."  Ex. 2.  Officers began executing the search warrant at 8:37 AM.  Outside of 1 Salvail Court, NPD officers located a .22 caliber Remington shell casing within three to four feet of where Parker's body had been as well as a bicycle with a pouch containing an empty gun holster.  The officers did not recover a firearm in their searches of either location.

Over the course of the investigation, NPD sent out three "be on the lookout" ("BOLO") alerts to law enforcement agencies in New England.  At 2:26 AM, on December 3, NPD issued the first BOLO, which read:

> *BOLO: Suspect involved in shooting that occurred in Nashua at 2331 hours.  Daniel DeGrace (DOB: 6-11-81) operating a beige Toyota Avalon, NH Reg 329 3905 which was seen leaving the area minutes after the shooting.  Information received that subject may be heading to Vermont.*

Ex. 1.  The 2:26 AM BOLO warned that DeGrace could be armed and requested that DeGrace be stopped and held for questioning by the NPD.  *Id.*  NPD issued a second BOLO at 9:24 AM with some additional details.  The 9:24 AM BOLO cautioned that DeGrace had a violent history including assaults on police as well as mental health issues.  Ex. 3.  The 9:24 AM BOLO noted that DeGrace was believed to be accompanied by Benjamin Mayberry, who was described as a 5'11'' white male weighing 155 pounds and who had brown hair and blue eyes.  *Id.*  The updated BOLO also cautioned that DeGrace "may still be in [*sic*] armed with rifle."  *Id.* Finally, at 9:30 AM, a NPD detective sent a third BOLO via email to a dispatcher with Vermont's Swanton Sector Border Patrol. Ex. 4.  The dispatcher summarized the contents of the BOLO over the radio to officers in the Swanton Sector, including the description of DeGrace's car, the dates of birth of both men, and the fact that they might be heading north to the border. Ex. 13.  The dispatcher also informed local units that the NPD

wanted DeGrace and Mayberry to be stopped and for questioning. Ex. 13. The dispatcher repeated the warning that the two men were considered armed and dangerous. *Id.*

## II. Stop and Arrest of Mayberry and DeGrace

On the morning of December 3, Border Patrol Agents Andrew Floriani and Justin Speaks were on duty and received the radio BOLO from the Swanton Border Patrol dispatcher. Around 11:00 AM, Floriani and Speaks were in a marked cruiser on Route 105 in Newport, Vermont, approximately six or seven miles from the Canadian border. As he approached a red light, Floriani observed a white Toyota vehicle containing two individuals that was heading in the opposite direction. When the light turned green, Floriani passed the vehicle. As he did, the driver avoided eye contact and hunched down. Floriani turned around and followed the vehicle, which was heading in the direction of the border. Floriani confirmed that vehicle's registration matched the one on the BOLO. Floriani then turned on his lights, and the vehicle pulled over.

Floriani and Speaks exited their cruiser, drew their weapons, and approached the vehicle. They ordered both individuals to stick their hands out of the window where they could be seen. Floriani then instructed the passenger (later identified as Mayberry) to exit of the vehicle, to face forward and walk backwards towards the cruiser, and then to lie face-

down on the ground to the side of the road.  The officers had
the driver (later identified as DeGrace) exit the vehicle in the
same fashion and lie face-down next to the passenger.  Officer
Speaks conducted a quick visual inspection of the vehicle.  Both
DeGrace and Mayberry were then searched, handcuffed, and placed
in the back of separate police vehicles.

Within minutes of the initial stop, Supervisory Border
Patrol Agent Matthew Curran arrived on the scene, by which time
both men were already on the side of the road in handcuffs.
Relying on photos that were attached to the final, emailed BOLO,
Curran identified DeGrace and Mayberry before they were placed
in police vehicles.  Curran conducted a quick search of the
interior of the car for dangerous items or co-conspirators,
including the front and back seat.  Curran also opened the
trunk, where he observed a number of items, including three
rifle barrels sticking out of a backpack.

Mayberry and DeGrace were transported to the Vermont State
Police barracks in Derby where they were held for questioning.
During interviews with investigators later that day, both men
waived their *Miranda* rights and confessed to stealing numerous
firearms from a residence in Vermont before travelling to
Nashua, where they sold one of the stolen firearms, a pink .22
caliber semi-automatic pistol, to Parker.

After interviewing both defendants, law enforcement officers sought and obtained a search warrant for DeGrace's vehicle.  Upon execution of the search warrant, officers discovered a total of eighteen firearms in the trunk. Subsequent investigation revealed that most of those guns, as well as a pink .22 caliber semi-automatic pistol, had been taken from a residence in Peacham, Vermont.

DISCUSSION

DeGrace and Mayberry move to suppress their statements on the grounds that their warrantless arrest constituted unlawful seizures under the Fourth Amendment and that any incriminating statements they made thereafter should be suppressed.  DeGrace and Mayberry also contend that the physical evidence taken from DeGrace's vehicle was the product of an illegal search and should be suppressed.

I.   **The Seizure of DeGrace and Mayberry**

    A.   **Arrest**

As an initial matter, the Government contends that DeGrace and Mayberry were not seized until after the trunk of DeGrace's car was opened and officers observed the barrels of several rifles.  The Government argues that both individuals were instead subject to reasonable restraints to protect the officers' safety while they conducted an investigatory stop of

11

DeGrace's vehicle and were therefore not subject to a full arrest.

Under the Fourth Amendment, an individual is "seized" whenever the circumstances surrounding his or her encounter with law enforcement is subjected to a "show of official authority such that 'a reasonable person would have believed he was not free to leave.'" *Florida v. Royer*, 460 U.S. 491, 502 (1983) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (Opinion of Stewart, J.)). "The test is an objective one, based on how a reasonable innocent person would view the encounter." *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (internal citations omitted). Several factors might suggest that a seizure occurred, including

> the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Id.* (quoting *United States v. Lee,* 916 F.2d 814, 819 (2d Cir. 1990)). The presence of one or more of these factors does not necessarily mean that an arrest has occurred. To the contrary, "'intrusive and aggressive police conduct' is not an arrest 'when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.'" *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (quoting *United States*

*v. Miles,* 247 F.3d 1009, 1012 (9th Cir. 2001) (citations omitted)).

In this case, the record demonstrates that DeGrace and Mayberry were subject to a full arrest. When Officers Floriani and Speaks pulled over DeGrace's vehicle, they drew their weapons and ordered Mayberry and then DeGrace out of the vehicle. One after another, the two were told to walk backwards and lay face-down on the ground to the side of the road, where they were searched and handcuffed. Under these circumstances, a reasonable person would not have believed he was free to leave.

Nor were the officers' actions merely reasonable safety precautions as part of an investigatory stop. In making this argument, Government relies on *Vargas*, a case in which a suspect, thought to be armed, fled when law enforcement approached him and struggled when they sought to approach him a second time. *Vargas*, 369 F.3d at 102. Here, Officers Floriani and Speaks had been informed that DeGrace might be armed, but the similarities with *Vargas* end there. DeGrace pulled over immediately after Floriani activated the lights on his cruiser, and both men complied with the officers' instructions to show their hands and get out of the car. Under these circumstances, the officers' display of force and restraint of both men amounted to a full arrest, not merely reasonable precautions pursuant to an investigative stop.

13

**B.    Probable Cause**

DeGrace and Mayberry argue that their arrest was invalid under the Fourth Amendment, which protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  "A warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been or is being committed."  *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008).  "Probable cause exists when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'"  *Id.* (quoting *Walczyk v. Rio,* 496 F.3d 139, 156 (2d Cir. 2007)).

Under the collective knowledge doctrine, information known to law enforcement officials other than the arresting or searching officer can form the basis for probable cause.  Thus, "where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."  *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).  An arresting officer may rely on an alert or bulletin issued by another

14

police department, providing the officer or officers responsible for issuing the alert or bulletin possessed sufficient information to establish probable cause.

### 1. DeGrace

At the time Border Patrol Agents Floriani and Speaks arrested DeGrace, NPD officers investigating Parker's shooting possessed sufficient evidence to establish probable cause that DeGrace had committed a felony.  Under New Hampshire law, it is a felony to tamper with physical evidence with the knowledge that an investigation is pending.  *See* N.H. Rev. Stat. Ann. § 641:6 (2013) ("A person commits a class B felony if, believing that an . . . investigation is pending or about to be instituted, he . . . [a]lters, destroys, conceals or removes any thing with a purpose to impair its verity or availability in such proceeding or investigation; . . . .").  Prior to DeGrace's arrest, NPD officers had spoken with multiple witnesses who had identified DeGrace and seen him outside 1 Salvail Court immediately after Parker's shooting.  Multiple witnesses also saw DeGrace load his car hurriedly and leave the scene before police arrived.  Within feet of Parker's body, NPD officers recovered a .22 casing but found no gun at the scene or during a subsequent search of DeGrace's apartment.  Finally, and most importantly, NPD officers had spoken with DeGrace's roommate, Carolyn Starkey, who said that DeGrace had called her early in

15

the morning of December 3 and told her he had taken the gun from the scene and thrown it in a river.  Starkey's account was corroborated by the records on her phone as well as DeGrace's cell phone records.  Based on these facts, NPD officers had knowledge of reasonably trustworthy information of facts and circumstances that were sufficient to warrant a person of reasonable caution in the belief that DeGrace had removed a gun from the scene of Parker's shooting and disposed of it with the knowledge that an investigation was impending, in violation of N.H. Rev. Stat. Ann. § 641:6.

There is one additional issue that was raised but not fully addressed by the parties.  As discussed above, it is clear that DeGrace was subject to a full arrest.  It is similarly beyond dispute that NPD officers possessed sufficient evidence to establish probable cause to justify DeGrace's arrest.  The somewhat unusual circumstance presented here, though, is that the officers responding to the NPD's request for a *Terry* stop conducted a full-fledged arrest.

What, if any, consequence should attach to the fact the arresting officers exceeded the scope of the investigating officers' request?  Reasonableness remains the lodestar of Fourth Amendment jurisprudence.  *See, e.g., Ornelas v. United States*, 517 U.S. 690, 696 (1996) ("The principal components of a determination of reasonable suspicion or probable cause will be

16

the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause."). The question raised here is a subtle but nonetheless important one because it requires the Court to consider whether an analysis of objective reasonableness is conducted through the lens of the arresting officer or from a more holistic standpoint.

The distinction may be theoretical, but it is not academic. There is a non-frivolous argument that it is objectively unreasonable for an officer to conduct a full arrest when he or she has only been asked to conduct a *Terry* stop, and if DeGrace's arrest is analyzed from the standpoint of an objectively reasonable officer in Floriani and Spears's position, it seems highly problematic. The collective knowledge doctrine is based on two assumptions: (1) that it is reasonable for an arresting officer to assume that the officer or department requesting a particular action has a factual basis to justify it, *see Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause."); and (2) that "at some point

17

along the line, some law enforcement official—or perhaps some agglomeration of such officials—involved must possess sufficient information to permit the conclusion that a search or arrest is justified." *United States v. Colon*, 250 F.3d 130, 136 (2001). Here, the first of those assumptions is plainly absent: Floriani and Speaks had no objective reason to think that the NPD had established probable cause to arrest DeGrace because the NPD had only asked them to stop him.

Nonetheless, it seems that a holistic approach to the reasonableness determination—one that considers the facts known to the investigating officers regardless of what action they requested—is consistent with precedent and with the logic of the collective knowledge doctrine. *See, e.g., United States v. Ramirez*, 473 F.3d 1026, 1031 (9th Cir. 2007) (concluding it was irrelevant that the arresting officer was directed to make a "traffic stop" because probable cause existed). Simply stated, the probable cause inquiry does not depend on the reasonableness of the arresting officers' reliance, whether it is good faith reliance on investigators' mistaken belief that there is probable cause, *see Whiteley*, 401 U.S. at 568 ("[A]n otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest."), or whether, as here, the officers exceed the scope of what is requested only to learn that their actions

18

were actually justified by information known to the investigating officers.  And even though the Court is troubled by the facts of this case, they are unlikely to be repeated with any frequency; police responding to an alert or bulletin will rarely exceed the scope of its request lest they risk arresting someone when information known to the investigating officers does not, in the end, justify the actions they have taken.

### 2.  Mayberry

Whether NPD officers had knowledge of facts substantiating probable cause that Mayberry had committed a felony at the time of his arrest presents a more complicated question.  The government first argues that there was probable cause to arrest Mayberry for unlawful possession of a firearm.  This theory is flawed.  Although NPD were aware that Mayberry had a criminal record and was subject to a New Hampshire restraining order prohibiting him from possessing firearms, neither the NPD nor the arresting officers had any information suggesting that Mayberry was or had been in possession of a gun at the time of his arrest.  Officers had reason to believe that DeGrace had taken a gun from the scene of Parker's shooting, but there was no indication that it was ever in Mayberry's possession.  Only after Mayberry had been arrested did Agent Curran open the trunk of DeGrace's vehicle and discover the rifle barrels that would have established a basis to believe that Mayberry had violated

19

his restraining order.  Probable cause for the arrest of
Mayberry therefore must have been grounded in the government's
alternative theory: that Mayberry aided or abetted DeGrace in a
substantive offense if it existed at all.

The government argues that the officers investigating and
arresting Mayberry had probable cause to believe that he aided
and abetted DeGrace in at least one of three crimes: the first
degree assault of Parker, the theft of Parker's gun, and
tampering with physical evidence.  At the time of Mayberry's
arrest, NPD officers knew the following: DeGrace had travelled
to Vermont one or two days prior and returned with Mayberry.  On
the night of the shooting, none of the residents of 1 Salvail
Court placed Mayberry outside the building immediately after
Parker's shooting.  Diaz saw Mayberry leave DeGrace's apartment
with a bag and blanket, load them into DeGrace's car, and depart
with DeGrace.  Officers knew from their interview of Gustafson
and from the pouch on Parker's bike that Parker was likely the
owner of a firearm, and they were unable to find that firearm at
the scene.  Because DeGrace's call to Starkey occurred
relatively soon after Mayberry and DeGrace left, the officers
also could reasonably have assumed that Mayberry was present
wherever DeGrace ditched the gun.  That assumption was further
bolstered by the fact that Mayberry was in the passenger seat of
DeGrace's car when it was pulled over in Newport, Vermont.

20

Officers had every reason to believe that the two had travelled the entire distance between Nashua and Newport together; however, there was no evidence to suggest that Mayberry was behind the wheel at any point.

New Hampshire law provides that a person is liable as an accomplice if "[w]ith the purpose of promoting or facilitating the commission of the offence, he . . . aids or agrees or attempts to aid such other person *in planning or committing it*." *Id.* § 626:8 (emphasis added). This language, adapted from the Model Penal Code, eliminated the common-law distinction between principals and accessories before the fact. *See State v. Morin*, 276 A.2d 476, 478 (N.H. 1971); Model Penal Code § 2.06 (1962). New Hampshire also replaced the common law crime of accessory after the fact with a narrower provision, N.H. Rev. Stat. § 642:3, which criminalizes hindering apprehension or prosecution. *State v. Durgin*, 959 A.2d 196, 198 (N.H. 2008) (noting that whereas the common law penalized help of any crime, the Model Penal Code identified specific forms of aid, such as harboring and concealing another, providing a weapon, transportation, or disguise as a means of avoiding apprehension, destruction of evidence, warning another of impending apprehension, or volunteering false information to a law enforcement officer); *see also* Model Penal Code § 242:3.

Based on these provisions, NPD officers did not have
sufficient basis to establish probable cause that Mayberry aided
and abetted either a theoretical first-degree assault of Parker
or the theft of the gun.  No facts indicated that Mayberry
participated in the planning or commission of either crime.  NPD
officers merely knew that Mayberry had arrived with DeGrace one
or two days prior and that the two men left 1 Salvail Court
together after Parker had been shot and after DeGrace had
apparently removed the gun from the scene.  By the time Mayberry
left the apartment and entered DeGrace's car, both crimes were
in theory complete; Parker had already been shot and DeGrace had
taken the gun from the scene.  And although Mayberry may have
known, either from the circumstances of his departure or from
something DeGrace said to him, that DeGrace was fleeing the
scene, no facts known to the NPD at the time of Mayberry's
arrest indicated that Mayberry assisted DeGrace in any material
way.  Mayberry did not provide transportation; instead, he left
as a passenger in DeGrace's vehicle.  Although Mayberry did
place a bag and blanket in DeGrace's car, law enforcement had no
reason to believe that these items contained any evidence
connected to Parker's shooting.

The government's next theory is that Mayberry aided DeGrace
in tampering with physical evidence, namely the gun DeGrace
professed to have removed from the scene.  The facts supporting

22

this theory are that Mayberry accompanied DeGrace while DeGrace disposed of the gun and that the two then continued driving north until they were ultimately stopped several miles from the Canadian border.  But while Mayberry's decision to leave Salvail Court with DeGrace in DeGrace's vehicle and accompany him to dispose of the gun may create reasonable suspicion that Mayberry committed a crime, it does not rise to the level of probable cause.  As the New Hampshire Supreme Court has explained,

> The crime of accomplice liability necessitates some active participation by the accomplice.  Mere presence at the scene of a crime is insufficient.  The defendant's presence, however, can be sufficient if it was intended to, and does, aid the primary actor.  Thus, the defendant's presence may constitute aiding and abetting when it is shown to encourage the perpetrator or facilitate the perpetrator's unlawful deed.

*State v. Merritt*, 738 A.2d 343, 346 (N.H. 1999) (internal citations and quotations omitted); *see also State v. Goodwin*, 118 N.H. 862, 866, 395 A.2d 1234, 1236 (1978).  "[M]ere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (establishing probable cause to search the premises of a tavern did not automatically mean that officers also had probable cause to search its patrons).  "[A] search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.*

23

Here, the facts known to law enforcement suggest little more than that Mayberry was present at the time that DeGrace disposed of the gun that injured Parker and that the two continued to travel together afterwards.  Although "a car passenger . . . will often be engaged in a common enterprise with the driver," *Wyoming v. Houghton,* 526 U.S. 295, 304-05 (1999), at the time of Mayberry's arrest, officers had no basis—apart from Mayberry and DeGrace's presence together—to infer that they were engaged in any joint enterprise or that Mayberry's presence encouraged DeGrace's actions.

The final argument at the government's disposal, though not one it posited, is that Mayberry's departure from the scene and apparent flight in the direction of Canada demonstrated consciousness of guilt.  *See United States v. Harley*, 682 F.2d 398, 401 (2d Cir. 1982) (reasoning that since juries can consider flight as evidence of consciousness of guilt and therefore guilt itself, police officers may rely on flight as part of the basis for reasonable suspicion or probable cause). "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that flight in a high-crime area is sufficient to establish reasonable suspicion).  But, "[a]lthough flight has been a legitimate factor in a finding of probable

cause, it has not been considered a 'reliable indicator of guilt without other circumstances to make its import less ambiguous.'" *United States v. Magda*, 547 F.2d 756, 763 (2d Cir. 1976) (*quoting United States v. Davis*, 458 F.2d 819, 822 (D.C. Cir. 1972)). *See also Wong Sun v. United States*, 371 U.S. 471, 483 & n.10 (1963) (flight from an unauthorized intrusion constituted ambiguous evidence of guilt for the purposes of probable cause); *United States v. Sharpe*, 470 U.S. 675, 706 (1985) (Brennan, J. dissenting) ("[F]light *alone* cannot give rise to probable cause; it must be coupled with pre-existing reasonable and articulable suspicion.") (emphasis in original).  Here, the fact that Mayberry accompanied DeGrace to Newport can only be generously characterized as flight, as Mayberry did not encounter law enforcement officers prior to leaving 1 Salvail Court.  In such circumstances, Mayberry's "flight," does not give rise to a reliable inference of guilt sufficient to support probable cause.

For these reasons, the totality of the circumstances surrounding Mayberry's arrest do not demonstrate that NPD and the arresting officers possessed sufficient knowledge to establish probable cause that Mayberry had committed any crime. Accordingly, the Court finds that Mayberry was unlawfully arrested in violation of his Fourth Amendment rights.

25

### C.   Application of the Exclusionary Rule to Mayberry's Statements

That Mayberry was subject to an illegal arrest does not mean that his inculpatory statements are automatically excluded. "Suppression is not justified unless 'the challenged evidence is in some sense the product of illegal governmental activity.'" *Segura v. United States*, 468 U.S. 796, 815 (1984) (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)).  The fundamental question is "'whether the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint.'"  *Mosby v. Senkowski*, 470 F.3d 515, 520 (2d Cir. 2006) (quoting *United States v. Ceccolini,* 435 U.S. 268, 273-74 (1978).  Multiple factors guide this determination, including the temporal proximity of the arrest and the confession, whether Miranda warnings were administered, the presence of intervening circumstances, as well as "the purpose and flagrancy of the official misconduct."  *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).  The voluntariness of the defendant's statement is a threshold requirement, and the prosecution bears the burden of showing admissibility.  *Id.* at 604.

A somewhat unusual question presented by Mayberry's case is whether the discovery of guns in the back of DeGrace's car might constitute an "intervening cause" sufficient to break the causal

connection between the illegality of Mayberry's arrest and his subsequent confession.  Some courts have found that when probable cause is established after a defendant's illegal arrest but before an inculpatory statement is made, the exclusionary rule does not apply, *see, e.g., United States v. Hernandez*, 75 F. App'x 637, 638 (9th Cir. 2003) ("[P]robable cause was independently established prior to any questioning."); *United States v. Molina*, No. 99-50376, 229 F.3d 1160 (9th Cir. 2000) (unpublished) ("Because probable cause was independently established prior to any questioning, Molina's statement was not the fruit of an illegal arrest."); however, that proposition is hardly uncontroversial.  *See United States v. Shaw*, 464 F.3d 615, 629 (6th Cir. 2006) ("[T]his type of post-arrest discovery of new evidence simply cannot, under the circumstances presented here, constitute an intervening circumstance that would break the causal connection between the illegal arrest and the subsequent confessions, particularly given that neither Shaw nor his interrogators knew about the alleged new evidence."); *Molina*, 229 F.3d at 1160 (Tashima, J. dissenting).

Assuming, without deciding, that the Court may consider Agent Curran's discovery of three rifle butts in the back of DeGrace's car as an intervening circumstance, the question remains whether that additional information—along with the other facts known to police at the time of Mayberry's arrest—could

have supported a reasonable belief that Mayberry had committed a crime.  In *Maryland v. Pringle*, 540 U.S. 366, 373 (2003), the Supreme Court confronted a situation in which officers discovered large quantities of cash and drugs in the passenger compartment of a vehicle during a legal search.  Officers arrested all three occupants despite the fact that each of them denied ownership or possession of the cash and drugs.  The Court rejected Pringle's contention that the facts were indistinguishable from *Ybarra* and that the officers had relied on his "mere propinquity to others independently suspected of criminal activity."  44 U.S. at 91.  The Court explained,

> This case is quite different from *Ybarra*. Pringle and his two companions were in a relatively small automobile, not a public tavern.  In *Wyoming v. Houghton,* 526 U.S. 295 (1999), we noted that "a car passenger-unlike the unwitting tavern patron in *Ybarra*-will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.,* at 304-305.  Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

> *Pringle*, 540 U.S. at 373 (2003).

Several features of this case distinguish it from *Pringle*. Here, the incriminating evidence was found in the trunk of the vehicle, where neither DeGrace nor Mayberry had immediate access.  *See, e.g. United States v. Montgomery*, 377 F.3d 582, 590-91 (6th Cir. 2004) (emphasizing the defendant's visual and

physical access to the contraband); *United States v. Hernandez*,
322 F.3d 592, 596 (9th Cir. 2003) (noting the defendant's
proximity to a large amount of illegal drugs in the vehicle).
Although the full search of the trunk after Mayberry's
confession yielded a total of eighteen guns, Curran only saw
three rifle butts during his brief inspection immediately after
Mayberry's arrest.  The quantity of guns known to officers at
the time of Mayberry's confession was therefore not indicative
of criminal activity.  Nor could the officers have connected
Mayberry in any way to the contents of DeGrace's trunk.  During
his inspection, Curran did not spot anything—such as one of
Mayberry's bags—that demonstrated that Mayberry had access to
the trunk.  At 1 Salvail Court, Kelly Duquette reported seeing
DeGrace fumble with items in the trunk but not Mayberry;
meanwhile, Tanisha Diaz, the only person who reported seeing
Mayberry at the scene, simply stated that he left DeGrace's
apartment carrying bags and that he left as a passenger in
DeGrace's car.  For these reasons, probable cause did not exist
to arrest Mayberry even if the information obtained from
Curran's search of the trunk were considered.  As such, there
was no "intervening cause" justifying admission of Mayberry's
statement even if the Court accepted the premise that the post-
arrest establishment of probable cause could interrupt the chain
of causation between an illegal arrest and a confession.

On the whole, the Court finds that the circumstances of
Mayberry's arrest require application of the exclusionary rule.
Mayberry was held by law enforcement and questioned within hours
of his arrest.  Though Mayberry's was provided with *Miranda*
warnings, there were no circumstances that interrupted the
causal chain between Mayberry's arrest and his confession.
While there is no evidence that the arresting officers
intentionally violated Mayberry's rights, their conduct was
lamentable in two respects:  first, they subjected both DeGrace
and Mayberry to a full arrest where only a *Terry* stop had been
requested; and second, the agents' warrantless search of
DeGrace's vehicle displayed a degree of unfamiliarity with the
constitutional limits of a search pursuant to a vehicle stop—
even though the search was ultimately justified by probable
cause.  For these reasons, Mayberry's motion to suppress the
statements obtained from him on December 3 is granted.

## III. Search of DeGrace's Vehicle

DeGrace and Mayberry also move to suppress the physical
evidence obtained from the trunk of DeGrace's vehicle on the
grounds that Officer Curran conducted an unlawful search when he
opened the trunk of DeGrace's vehicle after they were arrested.
As an initial matter, only DeGrace has standing to bring this
motion.  Mayberry was merely a passenger in the vehicle and as
such had no reasonable expectation of privacy in the contents of

30

the trunk.  *See Rakas v. Illinois*, 439 U.S. 128, 134 (1978);
*United States v. Paulino*, 850 F.2d 93, 97 (2d Cir. 1988)
("First, the person challenging the search must demonstrate a
subjective desire to keep his or her effects private; and,
second, the individual's subjective expectation must be one that
society accepts as reasonable.").

Under the objective standard this Court must apply, Officer
Curran's subjective belief that he was permitted to open the
trunk as part of a safety check for guns and other unidentified
co-conspirators is irrelevant.[1]  And because the collective
knowledge doctrine applies with equal force to vehicle searches
as it does to arrests, *United States v. Lyons*, 687 F.3d 754, 766
(6th Cir. 2012) ("The collective knowledge doctrine applies
equally to traffic stops and to vehicle searches."), the
ultimate question is whether information known to the NPD would
have provided probable cause to search DeGrace's vehicle.  *See*

---

[1] The Supreme Court has indicated that genuine safety or evidentiary
interests may justify a search of a vehicle.  *See Arizona v. Gant*, 556
U.S. 332, 347 (2009); *United States v. Jones*, 471 F.3d 868 (8th
Cir.2006) (where a vehicle with heavily-tinted glass, preventing
police from looking inside through windows, was parked in front of
premises where a search warrant was to be executed, and suspicious
activities were observed regarding the vehicle, a protective sweep
into the vehicle was justified for protection of the officers).
Nonetheless, Agent Curran's justification of his search as a safety
sweep seems spurious in this case.  By the time Curran arrived, both
occupants of the car were on the side of the road in handcuffs, and
Agent Speaks had already conducted a visual inspection of the vehicle.
Nor was there was any reason for law enforcement to think that there
might be an additional individual—whether a coconspirator or a victim—
hiding in the trunk of the car.  Under these circumstances, a search
of the trunk was not justified by genuine safety or evidentiary
concerns.

*United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004)
("[P]olice may conduct a warrantless search of a readily mobile
motor vehicle if probable cause exists to believe the vehicle
contains contraband or other evidence of a crime.") (internal
quotation omitted).  Probable cause to search a vehicle exists
where "there is a fair probability that contraband or evidence
of a crime will be found in a particular place." *Illinois v.
Gates*, 462 U.S. 213, 238 (1983).  The scope of a warrantless
search is defined by its object and the places in which there is
probable cause to believe that evidence may be found. *United
States v. Ross*, 456 U.S. 798, 824 (1982).

Many of the same facts that established probable cause for
the arrest of DeGrace also establish probable cause to search
his vehicle.  At the time Agent Curran opened the trunk, NPD
officers also knew from Kelly Duquette that DeGrace had fumbled
around with something in the back of his vehicle before leaving
the scene of Parker's shooting.  They also had reason to believe
that he had removed a gun from the scene, and although DeGrace
had told Starkey that he had thrown the gun in the river, there
was a fair probability that DeGrace had simply put the gun in
the trunk of his car.  Under these circumstances, there was
therefore probable cause to justify a warrantless search of
DeGrace's vehicle.

**CONCLUSION**

For the aforementioned reasons, DeGrace's motion to suppress is denied in full, and Mayberry's motion to suppress is granted with respect to his statements but denied with respect to the physical evidence obtained in the search of DeGrace's car.  The Court's finding that law enforcement officers did not have probable cause to arrest Mayberry at the time of his statement has no bearing on the question of whether probable cause existed to arrest and charge Mayberry with criminal offenses after a thorough search of the vehicle was completed.

Dated at Burlington, in the District of Vermont, this 11th day of July, 2013.

/s/William K. Sessions III
William K. Sessions III
U.S. District Court Judge